We are here on the matter of 5-25-0012 En Re Marriage of Jones. Counsel for the appellant, if you would approach and state your name. Thank you, Justice Schiller. Amanda Bradley for Elizabeth Libby Jones. May it please the court. Counsel, this case involves two structural defects present in the judgment of dissolution of marriage where the trial court did not reconcile the evidence with its conclusions drawn. This case was filed in 2022 and was tried over the spring of 2024 before the judgment of dissolution of marriage was entered in August of 2024. The first structural error is income and the second large structural error is the calculation of the marital estate vis-à-vis the loans that were taken for tax payments. First, income. In the judgment, the trial court calculated the average gross income of Mark and of Libby. But in doing so, it did not take into account the most recent income information it was testified to during the trial. It excluded 2022 and 2023 from its calculation of average gross income. Do we know why the trial court did that? It does not explain in the judgment of dissolution of marriage why the trial court excluded either 2022 or 2023. Was there a request by counsel to exclude those years? Not that I saw in the record. 2022 was testified about. The 2022 tax returns are in the record. 2023 taxes had not been fully completed yet, but it was estimated the amount of refunds that would be received on the financial affidavits. And it was known what the W-2 income portion of it was. Here we have multiple streams of income, pass-through income, distributions, tax refunds, and everything of that nature. So how do we know what the trial court used as their underlying numbers for that calculation? It took some of the pass-through income, the W-2s, and some of the other forms of income, but it doesn't explain which forms of income it took into account in reaching its gross income number, other than by listing it is only counting from 2018 through 2021. Did both parties, they submitted maintenance calculations to the court during the trial. Did both sides use the 22 and 23 income in their proposed maintenance calculations? I believe Libby's attorney did. I am not sure if Mr. Jones's attorney did. They argued at trial that she was not entitled to maintenance at all. I don't remember if they proposed an alternative, but it is their exhibits that comprise of the 2022 income and the tax returns. So there were separate exhibits for each maintenance calculation from each side, is that correct? I believe it was in the, for my client, it was part of their pleadings at a position statement type document in advance, as well as post-trial. And the court's order for maintenance varied from both, or the court adopted? The court varied from both calculations, saying that Libby's calculations were too high and Mark's were too low, and adopted a gross income calculation based on an average from 2018 through 2021. It does not explain why 2022 or 2023 was excluded or what the sum of the income was, which is also the trial court found that some of the income was income for the purposes of maintenance. Pass-through income from a business does not necessarily enrich one, but many, some of those dollars do end up in the pockets of it. Income is income per the Rogers court. It doesn't matter if it's recurring, non-recurring, a gift, a loan in excess of the amount of the obligation. It doesn't matter how it gets into your account, if you can use it to pay for your bills, it is income. And that leads to the second problem. Mark took substantial loans to pay taxes, a practice that began after the divorce was filed. I'm not arguing that the amount that he paid for taxes are income. I'm arguing about the difference between the amount paid for taxes and the tax refunds, which were substantial. The court awarded him the 23 income and is silent about the 21 and 22 refunds. And they, again, were over $700,000. But Rogers isn't going to necessarily say that all loan amounts are income. I mean, Rogers may look at it as under the lens of a gift and those types of things. But based on what I read in the briefing, I mean, it looks like a large portion of these loans did go for taxes, correct? Yes, a large portion did. It's not the amount that went for taxes. Taxes had to be paid. It is the amount of the difference, the refunds that were received, that are and should be considered income. Tegeler would say that a loan, such as a student loan, a mortgage, or in this case a loan to pay for taxes, is not income. But if you are borrowing more than what your obligation is and you have access to it, then it is income if you are using it to pay your bills. I also briefed a case that did say that substantial tax refunds can be considered a form of income. That actually speaks to the legislature's policy in rewriting the maintenance and child support statute for how we calculate gross and net income. Gross income is determined first for the purposes of maintenance. And that's where the court erred as it did not consider the most recent evidence of income that was present in court. From that, taxes, FICA taxes, and other forms of necessary paycheck withdrawals are taken out of that. When you have an individualized, it can include estimated taxes paid, but there was a history of way overpaying taxes. And those monies were unaccounted for as a form of income. The second place that the trial court erred in the calculation of income is it doesn't say what is the sum passed through income. It doesn't, it does not draw from the evidence to the conclusion what the sum is. And it is in that word sum passed through income that Mark was allowed to not have that counted for the purposes of maintenance. The second structural defect in the trial court's order again involves these loans. If they're not income, which they weren't, then the entirety of the amount should not be a debt to the marital estate. The excess amount should not have counted as a subtraction from the marital estate. Here, he borrowed $2.47 million. There's a second structural defect in that. Some of that was for 2024 in there. There were at least a few quarterly estimated payments that he took loans for to consider 2024. It is in the order in the chart at the end. They were divorced in August of 24. That is a post-marital debt that should be assigned solely to him. It is not, again, the tax obligations. They had to be paid. It is the difference between how much was needed and how much was borrowed that is the problem. And again, the borrowing well exceeded the tax obligations. While it's understandable that he did not want to underpay the tax obligations and incur penalties, the trial court in its order failed to account for any of the tax refunds, 21, which was received during the course of litigation, and 22, only accounting for 23 and awarding it to Mark, but not saying this was an over-borrowing against the marital estate. If the trial court had reconciled the amount that he needed to borrow with the amount that needed to be paid, the marital estate would have been larger. While Mark does have an obligation to pay these, this court can also consider them, as in Blasey, to be facetious loans. They're insider loans. They're given by his brother, nominally from the corporation, at favorable interest. They require annual interest payments, and they can be forgiven. No interest payments were ever made that were finally accounted for. While there are some places where some payments appear to be made, at the next loan, the payment has disappeared. And again, they can be forgiven. Anyway, they were nominally to preserve the marital estate's value through the businesses instead of receiving distributions, but they only began after the divorce was filed on the advice of the CFO, who at one point was and may still be an attorney. If they were outsider loans, like in Tegler, or if they had actual repayment terms, like in Awan, they would be true loans. But again, these loans, these $2.47 million in loans, were taken as they were fully needed and a subtraction from the marital estate, and they can be fully forgiven, and no interest payments were made. Mark didn't choose to take these from a bank or from a private entity because he would have had to make payments on those loans. They replaced the distributions that were received, which also weren't accounted for in either the income or in the marital estate, and they continued despite the loans throughout the case. But have they been required to take a distribution? Not required to take a distribution. Correct. They often did. Prior to the divorce being filed, they took distributions when they needed money. I understand, but I mean, there's no requirement that he has to take a distribution out of an existing company, though, correct? Correct. But he did take the loans. I mean, we've already established that, but there was a large portion of the loans that was used to pay the taxes. So to say that, and I don't remember the words you used to characterize them, but I mean, and some of them were not used to pay the taxes. Understood. But, I mean, taking a loan from the company doesn't necessarily, I mean, equate to, I don't think, did you use the word sham or something similar to that? I may have used the word sham. We'll go with that. Facetious, I think, is what I used. All right. Thank you. Or was it illusory? Illusory. That's it, illusory. When you calculated these loans, though, the money spent on the various tax decisions were multiple state taxes, correct? That's right. The taxes that were paid out were for multiple states. Yes. And they were included with CPA expenses and whatnot. It seemed to me that the loan amounts fairly equated the amounts that were spent. Is that not accurate? They were originally tendered to various taxing entities and the CPA and some accounting. And there's one of them that there was a carve-off for some personal expenses. What the difference is, is they were way overpayment of the taxes that were actually due. In prior years, they had rolled over refunds so that they were meeting the quarterly and the estimated taxes. Instead now, these refunds are coming in and not getting paid to the loans to reduce them. Instead, the one tax refund comes in, and it ends up as probably a capital contribution back to one of the businesses instead of any payment towards the loan or being used to pay for the next year's taxes. So while, yes, they did originally go to pay for taxes, it's the overpayment of the taxes that's the problem. The refunds. The refunds, yes. And the owners. What amount are we talking about? Based on the record, what is the amount that you're claiming should have been calculated? It's over a million dollars across 2021's refund, 2022's refund, and 2023's refund. The loans reflect 22, 23, and 24 taxes. And again, those structural errors in not counting what this income was and not rectifying the evidence with the conclusions is where the trial court is erred. And for those reasons, you should vacate and remand for further proceedings to determine what the actual income was and what the amount of loans should have been. Does the panel have any further questions? Any further questions? One question on the dissipation claim that your client asserted. Was that filed for the first time during the trial? It was filed in advance of trial. Okay. When was it filed? It was filed well outside of the statutory period per Hamilton. It was filed. Trial was reset and was filed in between. I want to say it was filed in January, but I will, when I return to the podium, I will give you the exact date and the exact page number. Did you then seek to amend it during trial based on evidence? I don't believe it was amended. It was argued about then in the written closing arguments. You argued that it should be amended at that point? No. It was the amount of dissipation was spoken about in the written closing arguments. Is that based on testimony that occurred during the trial? Yes. Okay. Okay. All right. Any further questions?  We'll have time for a couple more, obviously. Thank you. Counsel for the attorney? And if you want to state your name when you approach. Thank you. Your Honors, good afternoon. My name is Jennifer Cantrell, C-A-N-T-R-E-L-L. I'm with the law firm of Berger Shatt on behalf of the affilee Mark Jones. We're having a hard time hearing you. I'm sorry. Is that better? Okay. I try not to be too echoey. On behalf of affilee Mark Jones, thank you for giving us the opportunity to speak. I had an outline here, but I do need to speak to something that the Justice was asking counsel about, and that is notices of dissipation. We did, in fact, file two notices of dissipation. The first one appears in the record at, let me make sure I got my notes correct. The first one appears in the record at C-221 through 226. It was filed on January 25th of 2024. That notice of claim of dissipation claims $285,000 that Mark took in loans from the Entitino's Basin was dissipated, $1,346,788 from Jones Venture II, the main business at issue in this case, and $161,897 in other types of dissipation. What that leads to is a total of, apologies, I need to back up. There was also an amended notice of dissipation. That is in the secured CLR at pages 88 through 91. Libby's total additional claim of dissipation in that notice was $69,926.16. And if my math was a little off, someone can check it. I did the addition today. The total alleged dissipation other than loans from JV II was $516,823.16. Now, if you go to the trial court's judgment, specifically C-307, the judge stated that the parties had resolved a dissipation issue by stipulating that Libby's dissipation is $2,000 and that Mark's dissipation would be resolved by finding that the basin supply and the Titan well supply promissory notes would be his non-marital debt. And when you look at what is contained in the judgment regarding Mark's dissipation, you will find a number that is roughly $625,000. So that's what the trial court actually found his dissipation to be. And you have the notices that it's based on. Having addressed that singular issue, I'd like to go back to a couple of things from Mark's position that are. There is no cross-appeal here. There is no cross-appeal. Although divorce clients are never completely happy with their judgments, if you've got one that not everybody loves, it's probably right. There are some technical matters that Mark would like to address. First, and we raised this in our brief at the very beginning, we would ask this Court to review whether it actually has appropriate jurisdiction to consider Libby's claims that go beyond the issues of maintenance and dissipation. There's some significant argument in their brief talking about marital debt and the value of companies and this trust that's a big deal in the brief. This was an unusual notice of appeal. Most of the time, you file a notice of appeal, you set out the date of the judgment, and you say, hereby request that the Court review this judgment. Libby didn't do that. Her appeal is remarkably specific. It is a mention of trust. It specifically says, asking the Court to reverse on maintenance and on dissipation. She says it twice in her notice of appeal, that those are the only issues being appealed. She says it again in her docketing statement, which, while we recognize that's not jurisdictional, it's still informational to the appellee. And it's also consistent with the notice of motion to reconsider and clarify the judgment that she filed that also didn't touch on anything having to do with the trust or these valuation questions. And this is important because Maura received a judgment in August of 2024, dealt with the motion to reconsider in November of 2024. Libby filed her very specifically worded notice of appeal in December of 2025, and it was not until September of 2025. I'm sorry, December of 2024. It was not until September of 2025 that Mark was notified, by virtue of their brief, that these matters regarding the Mark A. Jones trust were being appealed. But you would agree that this Court has the power to liberally construe the notice of appeal? This Court has the power to do that. What we are suggesting is that it's in this unusual situation that you should not do so, because the language was so specific. That's all on the maintenance issue. I'd like to make sure you have some time to address that. Absolutely. In particular, the contention that the trial court erred in not considering the most recent income during the most recent years. And I think the question was asked of counsel, why was that? Was there any discussion about it? Was there any stipulations regarding that? What was the Court's reasoning, if we know? It wouldn't have been argument. It would have been argument, not a stipulation. The Court just specifically stated that it found it most appropriate to average four years, 2018, 2019, 2020, and 21, for Mark's income. And then it looked at the AGI and not merely Mark's W-2 to determine that number. I would suggest that the reason the Court did that and the reason why it made sense to do that is because the petition for dissolution in marriage was filed in 2021. Mark moved out and the parties began living their separate existences in 2021. That would be the last year that the marital standard of living would have existed for purposes of maintenance. Because even though we now have guidelines for applying to income for purposes of calculating maintenance, it's still a factor under the statute, under Section 504, that the Court must look at the marital standard of living to determine appropriate maintenance. But, counsel, you would agree that it's customary in most divorce cases that involve maintenance to look at the last three years' tax returns. That's pretty customary. It is customary, but it is not required. That's right. But we don't, do we have any indication, though? I mean, you're guessing why the Court did it? Do we know why the Court did it? The Court didn't say specifically, other than to make a finding within the exercise of the trial judge's discretion, that those four years were the most appropriate. And the explanation for why is because 2022. Your explanation why, not his explanation. The judge didn't say this.  But we submit and it's supported by the evidence. The numbers for the 2022 tax return are a significant, massive outlier from what had been historically happening in this family. The way we can deal with a massive outlier is to take more years into account in terms of averaging, usually. You don't just throw it out. Correct. Sometimes you do. Did you ask for a deviation? We asked. Our request was that no maintenance be awarded because she was receiving significant, we believe she would be receiving significant valuable property that could produce enough income for her to maintain her standard of living. And we still believe that she has enough property. If she needs more money, she's got lots of money to invest. But mostly, it's the matter of standard of living. There was a massive deviation, but the most important factor is this. The 2022 income deviation isn't real money to Mark. It was carry-through or pass-through income that was a significant bump from several of the businesses. But he didn't receive that money. I understand that. But in terms of calculating maintenance, we look at all sources of income, correct? I mean, we look at gifts. We look at loans. We look at, I mean, under the case law. That is correct if it's actually money received. Mark didn't actually receive that pass-through income. That's the point. There are the trust comes into play here as well as the businesses. There are several businesses that Mark has to report income on his tax returns, but it's phantom. He doesn't get the money. Didn't the trial court use some amount of pass-through income in coming up with this maintenance calculation?  Yes, he did. How do we understand the court's reasoning was and what amount did the court use? The court stated that he believed that some of the pass-through income reported on the tax returns probably was money that Mark actually received. And so what the judge did was he looked at those four years' tax returns, and instead of taking the net income, he took the AGI, adjusted gross income. And that gave Libby a big bump in the basis for her maintenance because his AGI in 2021 was significantly higher than had been historic. But I guess the question is, how did the court calculate income? The court took the net. How did it arrive specifically at the number it did? Because the court didn't accept either side's calculations. I can tell you exactly what the judge did. He took the AGI from the 2018, 2019, I'm sorry, 2018, 2019, 2020, and 2021 income tax returns, and he averaged that number. But he didn't use the most recent years. He did not use 2022, and there was no tax return in place for 2023, but that number wasn't there. But he threw out 2022. Because, again, our position is if you look at the record, you see the number for 2022 isn't real money that Mark received. But in the calculation for maintenance, it's not about receipt of the money. It's about the income. You could earn the money, and you could be taxed for the money, and the money could stay right in your business, but you're still calculating maintenance based on the amount of earned income. So it's not about receipt. I think focusing on the receipt of the income is – show me the case law that says the receipt of the income. Receipt. I think we cited the Messissoon case law in our brief that talks – and some of it is – there's some discussion in the Rogers case about, for instance, loans, where it says not all income is income. The court was very careful, even Rogers, to say, look, we're not saying every loan that someone receives is income. It's just that there are times when they are. And I apologize to the court. I didn't write it down. But there are many times when a business earns income, and you don't necessarily take a draw on that. But if it's a pass-through, that income is on your tax returns. That is typically then used in a calculation for maintenance because of this earning. So it doesn't matter if he leaves that earned income in the business or if he takes that income. It's still that underlying income number is the number that's used for calculating maintenance. Respectfully, Your Honor, I don't think that's accurate. It's not just earned income. What they look at is net income. And that is a different sort of creature. That's the money you get. And I think that if you look at the language of 504, I believe that that's what it's going to say. It's net income. It works very much like the child support guidelines, where there are built-in deductions from gross income that are applied before the calculations are done. So we need to talk about — do you have more questions on the maintenance issue here, on the calculation of maintenance? So just to be clear, you believe that the trial court's number for maintenance was based on an averaging of adjusted gross income for the years 2018 through 21? That is correct because the judge says so in his judgment. But that's actually contained in the judgment itself. And it's on C-313 of the record. Okay. Thank you. I talked about the question of jurisdiction, and I see that my yellow light is blinking. There are a couple of other waiver issues that I need to present to the court very quickly. Do you have a few? Yeah.  Once is, you know, I talked about the issues of whether or not the dissipation and maintenance should be the only things addressed. Even if this court says it has jurisdiction over everything in those briefs, Ruby wouldn't present any argument at trial to support her interesting legal theory that she had a beneficial interest in the Mark A. Jones Family Trust that should have been calculated as part of the marital estate. It's an interesting argument. It's a wrong argument. But it's not raised in the trial court. If you look at her written closing argument, which is in the security common law record 117 through 118, all she says is that Mark could have borrowed money from the trust to give her more. There's no basis for saying that she didn't raise the argument that her rights as a beneficiary during the marriage were a marital asset that she should have been entitled to. She also raises an argument in her reply brief that says that Mark had contributed his marital effort to a business owned by the trust, and that that should have been considered as something that gave her a marital property interest in the trust. Again, not raised in the trial court, not raised in her original brief. The only thing not raised in the reply brief is waived. That's Miller v. Miller, 268, L.A. Act 3, 132, page 140. More importantly, half of his paycheck every two weeks came from that business. So he was being compensated. But she didn't raise the argument. She's borrowed from raising it at the appellate level. Beneficial interest. I have a red light, and I haven't gotten a chance to discuss anything to do with the loans to JV2. If the court wants to ask me questions about it, I'm prepared to deal with them. Otherwise, we are willing to stand on the brief. We've addressed it very carefully. Any questions? No questions. Okay. Thank you very much. Thank you. We appreciate that. All right. Rebuttal? Yes. And counsel, the first question I'm going to ask is the definition of income for me, okay? In terms of a made-list calculation. Under 504 and 505. Per the Rogers Court, income is income. If it comes into your life and enriches you and can be used for bills, it is income. The difference is the difference between gross income and net income. Does 504 define gross income? It does define gross income. The Rogers Court defines it as all sources of income. I realize Rogers predates the amendments. But it's also defined in the statute as well. Yes. And the net, on a basis like this, is a standardized net or an individualized net income. So to reach the proper net, you have to start with the proper gross. You have to count all of it and then subtract out the things that are subtractible, which are the taxes and the ficatives and things of that nature. In an individualized case, again, that pass-through can be considered part of the income. There is a case that is instructive when it comes to the question of pass-through income. Morthy. Morthy, he had a lot of retained income. It was reported as pass-through. He would take a check out on the last business day of the year to avoid some Delaware taxes. It was an Illinois case, but he had a Delaware corporation. And on the first business day of the next year, he would redeposit the money into his bank account to be able to meet the expenses upcoming. And in that case, they said he didn't actually have constructive control over the money that was there. It was used to then meet expenses of the business. The tax overpayments per davis are considered, it can be considered a form of income like they can't, but they were not accounted for here. Children and Corporate both hold that the trial court should base its information on the current income. And yes, it was calculated at C-135 in June of 24 on our site and is lower than what the court ultimately ordered. But was it not stated here today, though, that the 23 tax returns were not done yet? How does the court calculate income if they don't have the 23 taxes? They had substantial financial information from 2023, and the amount that was estimated to be refunded is spoken about in the judgment of dissolution of marriage. It comes from Mark's affidavit and is awarded to him. But it is neither income, but it is a distribution against a marital estate. If the trial court wanted to exclude 22, then the amount of tax loans from 22 should not have been counted against a marital estate either. And they were substantial. And that is internally inconsistent. Either he needed to borrow money for taxes, he had income, and they should be considered for income or they shouldn't be part of the marital estate. But the trial court inconsistently excludes 22 but counts the loans for the 22 tax refund. I would submit to the court that this needs to be vacated and remanded on those issues, and I will briefly hit up. In our notice of appeal, we did say, and all just in further relief, asking for this court's affordable powers to be applied and to consider it on all of the issues I have briefed. Does the panel have any questions? Questions. Any other questions? All right. Thank you both for your well-reasoned arguments. We will take this matter under advisement. We will issue an order in due course. Now, due course, folks, I guess my admonishment would be to be patient. There are lots of cases before the court, but we will do our very best to get this order out as quickly as possible. All right. Thank you very much. We stand in recess until tomorrow.